## JOHN BUTLER *vs.* REUBEN A. HUSE *et als.*

*Complaint for flowage—not maintained if either defendant had the right.*

A complaint for flowage cannot be sustained if either of several respondents had the right to flow the complainant's premises, in the manner and to the extent stated in the complaint. The conveyance of a dam and mills, by necessary implication, carries with it the right to flow the grantor's land then flowed by such dam, and which inevitably must be flowed by a fair and proper use of the dam and mills.

Mill owners have a right to maintain their dam as it was at the time of the deeds to them; and if, through want of repair for a series of years subsequent to that, it lets the water escape, the owners have the right to repair and tighten it, although the water is thereby raised higher and retained longer than it was while the dam was in a dilapidated condition.

Where the owner of land flowed by a dam and of two-thirds of a mill privilege upon that dam conveys one-third of the privilege and dam, with an incidental right to flow so much land as was then flowed by said dam, no subsequent deeds of the flowed land or of the other third of the dam—and no reservations or limitations in such deeds—can affect this right of flowage, as it existed at the time of the conveyance of the third first conveyed.

Where the rights of both parties depend upon deeds—neither setting up any claim by prescription—parol evidence of the manner in which these rights have been exercised, and of declarations respecting them, are irrelevant and inadmissible.

ON EXCEPTIONS.

COMPLAINT FOR FLOWAGE of the plaintiff's meadow by the defendants' dam, between the middle of May and the first of Sep-

tember of 1867, and of each year since 1867, when the dam was repaired and rebuilt. The defendants claimed that they did not then raise the dam any higher than the old dams were, and that they had a right to build and maintain it as they did under their deeds.

In 1818 Samuel Quimby owned the whole estate of these parties, all of whom now claim under him. December 27, 1848, he conveyed the portion now owned by the plaintiff to Jeremy Dunn, reserving "the right of flowing the stream on and around the above described premises as usual, from the first of September to the fifteenth of May in each year; the remainder of the time in each year the said Quimby is to draw, or cause to be drawn off, the water in said pond to the top of a large pine stump, standing near the dam of said mill, or so low as not to flow the meadow." Upon the twenty-seventh day of December, 1852, Mr. Dunn transferred to the plaintiff the title thus obtained, "with the same reservations as set forth in the deed" aforesaid from Quimby to Dunn.

More than thirty years before this conveyance to Dunn, Mr. Quimby, by his deed dated November 3, 1818, sold to Phineas Taylor, certain property, by metes and bounds, "containing the whole of the land formerly belonging to the mill privilege," of which this dam is part, "with a privilege to said Taylor and his heirs to take from the mill-dam a sufficient supply of water for the tanning business in all its branches, viz., one gate for the grinding of bark and one for fulling of hides and rolling of leather, reserving, nevertheless, to myself the right of taking a sufficient supply of water for a grist mill, should I at any time hereafter erect such; and I, the said Quimby, do further agree with the aforesaid Taylor, his heirs and assigns, and bind and obligate myself, my heirs and assigns, to put in good repair two-thirds of said dam in thirty days from the date of this deed, and to support and keep in due and constant repair the same two-thirds; and the said Taylor, his heirs and assigns, is to do the same for the remaining third part, so that no stoppage or obstruction shall arise, so far as regards said Taylor's privilege, or share of this property."

In the spring of 1824, Phineas Taylor transferred his title to Samuel H. and Orrin E. Taylor; and on the nineteenth day of November, 1838, Samuel Quimby conveyed to Orin E. Taylor "all that part of said privilege which I deeded to Phineas Taylor the third day of November, 1818, which I then, in said deed, reserved to myself, to wit: the right to restrict the said Taylor in said privilege to water for no other purpose than a tannery; and the said Orrin E. Taylor shall have and occupy all the rights and privileges of the one-third part of the Page privilege aforesaid, together with the right of flowage, the same as though no restrictions had been made to the said Phineas Taylor."

After the death of Samuel Quimby, his heirs at law, on the fifth day of February, 1855, conveyed to Merrill Hunt certain premises embracing five parcels, the first of which enclosed a section of the dam in question; the second parcel of land adjoined that first described, and was conveyed "with all the mills, buildings, dams and fixtures thereupon and thereunto appertaining, with all the estate, interest and right to the dams, water and head of water, and right of flowing said Taylor's pond and stream, which the late Dr. Samuel Quimby had in and to the same at the time of his decease." The other lots had no connection with this controversy. Merrill Hunt's title passed to the defendants prior to 1867. There was testimony tending to prove that the top of the pine stump, mentioned in the deed from Quimby to Dunn, was recognized and held by Dr. Quimby and some other owners of the mills to be the point of highwater mark from May to September, for some years after 1847. One Haines, while owning an interest in the dam and mills, removed the stump.

The plaintiff called J. F. Fellows, who operated the saw mill, under a lease from Dr. Quimby, from 1848 to 1850, and asked him what he had to do with that stump, with regard to water? "By instructions of the owners, or anybody else, what was your practice with regard to the water? What instructions or declarations had you from the owners in regard to it?" To each of these questions the defendants interposed an objection and they were all

Butler *v.* Huse.

excluded, to which the plaintiff excepted, as well as to the following instructions in the charge to the jury. The judge said: "From sundry conveyances, from 1818, down to the present time, these defendants have become the owners of this dam; not conveyances, as I understand it, of an undivided share, but each one of a certain portion of the dam. The first question that arises is as to their rights. Well, they are coupled all together in this complaint, and I am not aware of any provision of law that would authorize an action against them in any other form; the statute provides that they shall be joined, and therefore I hold that if one of them has the right to flow back this water as it has been flowed, then this action cannot be sustained; because it would be immaterial to the plaintiff, if he was subject to this right of flowage, whether one had the right or two or three of them. We come then directly to this right of flowage. For the purposes of this trial, I instruct you that the several deeds in this case would give the right to flow the land as the dam stood at the time of the several conveyances." . . . "There has been no complaint of flowage down to 1867. I do not understand that the plaintiff complains that there has been any more flowage up to that time than the parties had a right to flow; and I understand the counsel now, that if it had only been flowed subsequently to that time as it was previously, there would have been no complaint at this time. That narrows the case down to a very small compass. It brings it substantially, and perhaps solely, to the single question whether or not, when that dam was rebuilt or repaired in 1867, it was built any higher than it was before. That is really the question for you to settle. The plaintiff's testimony tends to show that there was more water retained by that dam, after its repair, than there was before. That might arise from the greater height of the dam, or from its greater tightness. . . . Now these parties have a right to this dam as it was at the date of their deeds; and if it became out of repair, and by this means let off the water for a series of years subsequent to that, and they then chose to tighten it, they would have a perfect legal right to do so; a right to all

that was conveyed to them, and just what was conveyed to them. Therefore, they would have a right to sustain the dam in good repair, as it was when their deeds were made. . . . . . . If the dam was built higher, and by that means flowed back to a greater height, and there was injury; or in consequence of its greater height, retained it longer, the plaintiff will be entitled to recover; but if it was built no higher, then the defendants will be entitled to your verdict."

The verdict was for the defendants.

*E. Kempton,* for the plaintiff.

The ruling at *nisi prius* was that the defendants' deeds gave them the right of flowage. The correctness of this construction is the first and principal question in this case. The gravamen of the complaint is that the plaintiff's meadow has been flowed between the fifteenth of May and the first of September. The defendants claim the right to flow it, at all seasons of the year, as high as the dam of 1867 could flow. Quimby's deed of November 3, 1818, to Phineas Taylor contained no grant of any right to flow any land whatever, but only to use a definite amount of water for a specific purpose, the grantor retaining in his own hands the management of the water and dam. And by his deed of November 19, 1838, to Orin E. Taylor, Dr. Quimby only removed the restrictions of the former deed, but did not enlarge the grant. In fact, there is no evidence that Quimby then had any right to flow any lands; especially any not immediately adjoining the dam. There is no proof that, prior to 1867, the plaintiff's land, now flowed, was flowed at all; and the burden was upon the defence to prove this affirmatively, if they relied upon it.

But all the deeds show they had no right to flow this meadow between May 15, and the first day of September; and the testimony of Fellows should have been admitted as the declarations of those in possession of real estate as to the nature and limitations of their title and rights therein. *Chapman* v. *Twitchell,* 37 Maine, 59.

The instructions excepted to, relative to the extent of the right to flow, would have been correct had a prescriptive right been claimed; but they do not apply to one claimed to exist by positive grant, evidenced by deeds produced in court. According to the instruction, if a sale of mills and a water power was made and a conveyance had when the plank and flush boards were all in their places, when the pond and dam were full, and the lands above all over-flowed—the grantee would acquire a good and perfect title to the whole and a legal right to maintain the dam, and retain the water as it then was—or as the dam stood at the time of the conveyance. He would be entitled to all these regardless of the right or title of the grantor.

It would seem more reasonable that a man could convey no right to flow any higher than he legally might himself flow, even at the date of his conveyance his dam did raise the water to a higher point. The height of the dam, instead of the height of the water, in 1867 was made the criterion of the defendant's rights.

The issue to be tried was the right to flow the plaintiff's meadow; no matter how high the dam was prior to 1867, if it had never before retained water enough to flow this land.

*A. Libbey,* for the defendants.

The rights of Orin E. Taylor, (one of the defendants) under his deeds, are a defence to all. *Prescott* v. *White,* 21 Pick., 341; *Morse* v. *Marshall,* 11 Allen, 229; *Richardson* v. *Bigelow,* 15 Gray, 154.

Neither party claimed by user, but both by deeds; hence, the questions excluded and not answered were immaterial.

VIRGIN, J. The presiding justice instructed the jury that the respondents "have a right to the dam as it was at the date of their deeds; and if it became out of repair and by that means let off the water for a year or a series of years subsequent to that, and they then chose to tighten the dam, they would have a legal right to do so, because they would have a right to all that was conveyed to them and just what was conveyed to them. ... The only ques-

tion then is whether or not the dam in 1867, when it was repaired, was made higher than the one which had previously existed." The jury found for the defendants. With this finding the complainant has expressed no dissatisfaction. He does, however, except to the instruction; but the only testimony he has given us *is* that contained in the deeds put into the case.

The instruction is in strict accordance with the principle established by a large multitude of decisions including several in our own State.

By his deed of November 3, 1818, Quimby, under whom both parties claim, conveyed by metes and bounds the east third of the Page mill privilege and dam, with certain restrictions as to the use of the water. By that of November 19, 1838, he conveyed "all that part of said privilege which I deeded November 3, 1818, which I then reserved, to wit,—the right to restrict the said Taylor in said privilege of water for no other purpose than for a tannery; and the said Orin E. Taylor shall have and occupy all the rights and privileges of the one-third of the Page privilege aforesaid together with the right of flowage, the same as though no restrictions had been made."

These deeds taken together granted not only what is expressly mentioned therein as they then existed, but by implication of law, all things necessary to the beneficial use and reasonable enjoyment of the premises mentioned, which Quimby then owned and could convey; and the manner in which this privilege was for so long a time openly and notoriously used and permitted to be used is swift evidence of what the parties to the grant intended and understood to pass by it. Quimby then owned the whole territory including the meadow flowed which subsequently came to be owned by the complainant. When he conveyed a part to Taylor the latter took it with all the necessary benefits which appeared at the time to belong to it, as between it and the remainder, retained by Quimby, among which was the right to flow the remainder as the dam then flowed. A subsequent conveyance of any portion or all of the remainder by Quimby could in nowise

deprive Taylor of any rights acquired by his deeds. If the meadow was then subject to be flowed Quimby could only convey it subject to such servitude. *Hathorn* v. *Stinson*, 10 Maine, 224; *Preble* v. *Reed*, 17 Maine, 169; *Rackley* v. *Sprague*, Id., 281; *Elliot* v. *Shepherd*, 25 Maine, 378; *Dunkle* v. *Wilton R. R. Co.*, 24 N. H., 495, and cases there cited; Angell on Watercourses, § 158, *et seq.*

The reservation in relation to flowing in Quimby's deed to Dunn, of December 27, 1848, and in Dunn's deed to the complainant, of December 27, 1852, could not restrict the rights of the defendant, Taylor, previously acquired. The testimony offered by the complainant and excluded, was not material to the issue and was rightfully excluded. Though Quimby bound himself not to flow the complainant's meadow "between the fifteenth of May and the first of September in each year," this could not bind the defendant Taylor—and "the gravamen of the complaint is" (using the language of his counsel) "that the complainant's meadow has been flowed between the fifteenth of May and the first of September."

In a process of this nature, all the owners of the dam must be joined as respondents. *Moor* v. *Shaw*, 47 Maine, 88. The defendant, Taylor, by his deeds from the complainant's grantor has the right to flow the complainant's meadow without compensation. It is therefore immaterial to the complainant whether or not the other defendants have the right. If that had become essential to the defence we should find no difficulty in finding it in the same deeds.                    *Exceptions overruled.*

APPLETON, C. J., CUTTING, DICKERSON, BARROWS and DANFORTH, JJ., concurred.